Robert BUTLER, et al., Plaintiffs,

v.

The ALABAMA JUDICIAL INQUIRY COMMISSION, et al., Defendants.

No. Civ.A. 00–D–976–N.

United States District Court, M.D. Alabama, Northern Division.

Aug. 3, 2000.

## MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the court is Plaintiffs' Motion For Preliminary Injunction, filed July 24, 2000. Also before the court is Defendants' Motion To Dismiss, filed July 27, 2000.[1]

After a hearing on the aforementioned Motions, and after careful consideration of the pleadings, the arguments of the parties, the relevant case law, and the record as a whole, the court finds as follows: Defendants' Motion To Dismiss is due to be denied and Plaintiffs' Motion For Preliminary Injunction is due to be granted in accordance with the terms and conditions set forth herein.

## I. JURISDICTION

The court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343(3) (civil rights jurisdiction).[2] The Parties do not contest personal jurisdiction or venue.

## II. BACKGROUND[3]

Plaintiffs are Justice Harold F. See, Jr. ("Justice See"), an Associate Justice of the Supreme Court of Alabama; Judge W. Thomas Gaither ("Judge Gaither"), who "previously has served as a District Judge and Circuit Judge in the Third Judicial Circuit of Alabama," and who "is a potential future candidate for a judgeship"; and Robert Butler ("Butler"), "a registered voter in the State of Alabama" who "participates as a voter in judicial elections in Alabama." Defendants are the Alabama Judicial Inquiry Commission ("JIC"), JIC's Commissioner, Honorable Randall L. Cole, and the following seven members of the JIC: Norman E. Waldrop, Jr., Esquire; Honorable James M. White; Honorable P. Ben McLauchlin, Jr.; Lee E. Portis, Esquire; David Scott, Esquire; Dr. Greg Sullivan; and J. Mark White, Esquire.

The court will first address Defendants' Motion To Dismiss, wherein Defendants argue that the court must abstain from ruling on a challenge to the constitutionality of two of Alabama's Canons of Judicial Ethics that are the subject of pending state disciplinary proceedings against Justice See in the Alabama Court of the Judiciary. Finding that the Motion To Dismiss is due to be denied, the court will then address Plaintiffs' Motion For Preliminary Injunction.

## III. DEFENDANTS' MOTION TO DISMISS

■ Defendants contend that this court should abstain from enjoining the current state court proceeding against Justice See pursuant to the dictates of 28 U.S.C. § 2283 ("Anti–Injunction Act") and the *Younger* Abstention Doctrine.[4] Because

---

1. The Parties filed extensive briefs regarding both of the Motions before the court. Further, the court held an evidentiary hearing on the Motions on August 2, 2000.

2. The court's exercise of subject matter jurisdiction is pursuant to its analysis regarding the *Younger* Abstention Doctrine in Part III below.

3. In the court's July 28, 2000, Memorandum Opinion And Order, the court discussed in detail the procedural and factual background of this case. These facts need not be repeated here.

4. The Anti–Injunction Act, codified in 28 U.S.C. § 2283, prohibits federal courts from

enjoining state court proceedings except as expressly authorized by an Act of Congress. In *Mitchum v. Foster*, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972), the United States Supreme Court held that § 1983 authorizes federal court injunctions of state proceedings, and that § 1983 actions, like the instant action, are specifically excepted from the Anti–Injunction Act. The Court explained:

> The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional actions under color of state law, "whether the action be executive, legislative or judicial." In carrying out that purpose, Congress plainly authorized the

the court finds that the Anti–Injunction Act does not mandate abstention, *see supra*, note 4, the remaining issue raised in Defendants' Motion To Dismiss is whether the court must abstain from interfering with the prosecution of the JIC's complaint against Justice See, pursuant to the *Younger* Abstention Doctrine. The court finds that this matter involves extraordinary circumstances under the *Younger* Abstention Doctrine such that the court must not abstain in this matter.

Generally, the abstention doctrine addresses the delicate balance between federal and state sovereignty and attempts to resolve "difficult problems of coordination and cooperation between state courts and federal courts, and also poses the potential for serious interference by one system with the other." Georgene M. Vairo, *Problems in Federal Forum and Concurrent Federal State Jurisdiction: Supplemental Jurisdiction; Diversity Jurisdiction; Removal; Preemption; Venue; Transfer of Venue; Personal Jurisdiction, Abstention and the All Writs Act,* SE 28 ALI–ABA 277, 360 (1999). In short, the abstention doctrine is concerned with notions of comity and federalism.

█ The specific abstention doctrine at issue here was first articulated in the case of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). That case, and its progeny, mandate that, absent extraordinary circumstances, a federal court should abstain from enjoining a pending state court proceeding. As stated by the Eleventh Circuit, "[t]his 'settled law,' intended to preserve the independence of our concurrent judicial systems, requires '[ ] sensitive consideration of ongoing proceedings in state courts' and 'that a federal court tread lightly when a state proceeding

is already underway.' " *The News–Journal Corp. v. Foxman,* 939 F.2d 1499, 1508 (11th Cir.1991) (citations omitted). In essence, federal courts should not enjoin state court proceedings under normal circumstances. *See Huffman v. Pursue, Ltd.,* 420 U.S. 592, 600, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975).

Keeping these principles in mind, the court must determine, generally, whether an extraordinary circumstance exists so as to remove this case from the purview of the *Younger* Abstention Doctrine. Under said doctrine, as applied in *Middlesex County Ethics Comm. v. Garden State Bar Assoc.,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982), the court finds that this case presents an extraordinary circumstance. Therefore, the court finds that it is not required to abstain from deciding the issues raised in Plaintiffs' Complaint.

█ At the outset, the court acknowledges the strong principles of comity, federalism, and deference to state sovereignty. The court strongly believes that it should not exercise subject matter jurisdiction over controversies better left to the State. On the other hand, the court acknowledges the fundamental principal that "federal courts have a 'virtually unflagging' obligation to exercise their jurisdiction" when appropriate. *Deakins v. Monaghan,* 484 U.S. 193, 203, 108 S.Ct. 523, 98 L.Ed.2d 529 (1988) (quoting *Colorado River Water Conserv. Distr. v. United States,* 424 U.S. 800, 813, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)); *see also Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 14–15, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). To act otherwise would do treason to the constitution of this

federal courts to issue injunctions in § 1983 actions, by expressly authorizing "a suit in equity" as one of the means of redress. And this Court long ago recognized that federal injunctive relief against a state court proceeding can in some circumstances be essential to prevent great, immediate, and irreparable loss of a person's constitutional rights.

*Id.* at 242, 92 S.Ct. 2151 (citations omitted).

It is undisputed that Plaintiffs' Complaint seeks relief under § 1983. Because Plaintiffs specifically pleaded their claims under § 1983, the Anti–Injunction Act does not preclude the court from granting an injunction. Therefore, the court finds no merit in Defendants' assertion that the Anti–Injunction Act bars relief in this action.

great country and would ignore the duties and obligations that federal courts were established to carry out. This is especially true when, as here, core First Amendment protections are at stake. Indeed, the old Fifth Circuit stated that where the interest "in comity collides with the paramount institutional interests protected by the First Amendment, comity must yield." *Machesky v. Bizzell*, 414 F.2d 283, 291 (5th Cir. 1969) [5], *distinguished in McKusick v. City of Melbourne, Florida*, 96 F.3d 478 (11th Cir.1996). Therefore, the court must carefully consider this matter because of the monumental interests at stake.

For guidance, the court looks to the aforementioned case of *Middlesex County Ethics Comm. v. Garden State Bar Assoc.*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982). In *Middlesex*, a case similar to the one at hand, Lennox Hinds ("Hinds"), an attorney licensed to practice law in New Jersey, filed suit in federal court seeking to enjoin state disciplinary proceedings. The Middlesex County Ethics Committee, the members of whom are appointed by the New Jersey Supreme Court, charged Hinds with violating the State's Disciplinary Rules of the Code of Professional Responsibility ("disciplinary rules"). *Id.* at 425–26, 102 S.Ct. 2515. The charges stemmed from Hinds' comments, made at the beginning of a criminal trial during a press conference. At the press conference, Hinds criticized the presiding judge's "judicial temperament and racial insensitivity" and characterized the proceedings as "a travesty," a "legalized lynching," and "a kangaroo court." *Id.* at 428. The disciplinary rules which Hinds allegedly violated prohibited an attorney from "[e]ngag[ing] in conduct that is prejudicial to the administration of justice" and prohibited "extrajudicial statements by lawyers associated with the prosecution or defense of a criminal matter." [6] *Id.*

Rather than file an answer to the charges, as required under the disciplinary rules procedures, Hinds filed an action in federal court naming several defendants, including the Middlesex County Ethics Committee. Hinds claimed that the disciplinary rules violated his First Amendment rights and that the rules were vague and overbroad. The district court abstained on the basis of *Younger* and dismissed the complaint. *Id.* at 429, 102 S.Ct. 2515.

The Third Circuit, however, "reversed on the ground that the state bar disciplinary proceedings did not provide a meaningful opportunity to adjudicate constitutional claims." *Id.* On petition for rehearing, the Middlesex County Ethics Committee submitted an affidavit from the Clerk of the New Jersey Supreme Court. In the affidavit, the Clerk "stated that the New Jersey Supreme Court would directly consider Hinds' constitutional challenges and that the court would consider whether such a procedure should be made explicit in the Supreme Court rules." *Id.* at 430, 102 S.Ct. 2515. However, the Third Circuit refused to consider the affidavit, "stating that the relevant facts concerning abstention are those that existed at the time of the District Court's decision." *Id.*

In reversing the decision of the Third Circuit, the Supreme Court of the United States set forth a three-part test for determining whether abstention was appropriate. First, the Court asked whether "state bar disciplinary hearings within the constitutionally prescribed jurisdiction of the State Supreme Court constitute an ongoing state judicial proceeding." *Id.* at 432, 102 S.Ct. 2515. Second, the Court inquired as to whether "the proceedings implicate important state interests." *Id.* Third, the Court asked whether there was "an adequate opportunity in the state proceedings to raise constitutional chal-

---

**5.** Decisions of the former Fifth Circuit rendered prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

**6.** The New Jersey Supreme Court, which is vested with the responsibility for licensing and disciplining attorneys, adopted the disciplinary rules. *Id.* at 428 n. 5.

lenges." *Id.* The Supreme Court answered each question in the affirmative.

First, the Supreme Court held that "the notion of comity" between federal and state courts applied to state bar disciplinary proceedings because they were "judicial in nature," having been established under the state constitution and state supreme court rules. *Id.* at 432–34, 102 S.Ct. 2515. Second, the Supreme Court held that the proceedings implicated important state interests in assuring the ethical and professional conduct of the legal profession. The Supreme Court observed that "[s]tates traditionally have exercised extensive control over the professional conduct of attorneys." *Id.* at 434, 102 S.Ct. 2515.

Third, the Supreme Court ruled that the proceedings provided adequate opportunities for the accused to raise constitutional challenges. *Id.* at 435, 102 S.Ct. 2515. The Court set forth three grounds in support of this ruling. The first two grounds are as follows: (1) "Hinds failed to respond to the complaint filed by the [Middlesex County] Ethics Committee and failed even to attempt to raise any federal constitutional challenge in the state proceedings"; and (2) Hinds "points to nothing existing at the time the complaint was brought by the [Middlesex County] Ethics Committee to indicate that the members of the Ethics Committee, the majority of whom are lawyers, would have refused to consider a claim that the rules which they were enforcing, violated federal constitutional guarantees." *Id.* As emphasized by the Supreme Court, "[a]bstention is based upon the theory that '[t]he accused should first set up and rely upon his defense in the state courts, even though this involves a challenge of the validity of some statute, unless it plainly appears that this course would not afford adequate protection.'" *Id.* (quoting *Younger*, 401 U.S. at 45, 91 S.Ct. 746).

The Supreme Court explained the third reason as follows:

In light of the unique relationship between the New Jersey Supreme Court and the local Ethics Committee, and in view of the nature of the proceedings, it is difficult to conclude that there was no "adequate opportunity" for respondent Hinds to raise his constitutional claims. 457 U.S. at 435–436, 102 S.Ct. 2515. Further, "[w]hatever doubt, if any, that may have existed about respondent Hinds' ability to have constitutional challenges heard in the bar disciplinary hearings was laid to rest by the subsequent actions of the New Jersey Supreme Court." *Id.* at 436, 102 S.Ct. 2515. "Prior to the filing of the petition for certiorari in this Court the New Jersey Supreme Court sua sponte entertained the constitutional issues raised by respondent Hinds." *Id.*

The Supreme Court further noted that the New Jersey Supreme Court amended the disciplinary rules "to expressly permit a motion directly to the New Jersey Supreme Court for interlocutory adjudication of constitutional issues." *Id.* at 436 n. 15, 102 S.Ct. 2515. "Even if interlocutory review is not granted, constitutional issues are preserved for consideration by the New Jersey Supreme Court." *Id.* In sum, the Supreme Court held that Hinds "had abundant opportunity to present his constitutional challenges in the state disciplinary proceedings." *Id.* at 436, 102 S.Ct. 2515.

■ Turning now to the facts of the case sub judice, the court will apply the three-part test of *Middlesex*. First, the court finds that the "notion of comity" between federal and state courts applies to state judicial disciplinary proceedings. Similar to state bar disciplinary proceedings, judicial disciplinary proceedings are "judicial in nature," having been established under the state constitution and state supreme court rules. *Id.* at 431–34, 102 S.Ct. 2515; *see also Am. Civil Liberties Union v. The Florida Bar*, 999 F.2d 1486, 1493 n. 15 (11th Cir.1993) ("*Younger* applies to state disciplinary proceedings because they are 'judicial in nature.'") (quoting *Younger*, 401 U.S. at 37, 91 S.Ct. 746). Second, the court finds, and the Parties do not dispute, that the proceed-

ings instituted by the JIC implicate important state interests in assuring the ethical and professional conduct of the state judiciary. *See Middlesex,* 457 U.S. at 434, 102 S.Ct. 2515.

Third, examining the final prong of the *Middlesex* test, the court must determine whether Justice See has an adequate opportunity in the state proceedings to raise constitutional challenges to the Canons at issue. For the reasons that follow, the court finds that Justice See does not have such an opportunity.

First, unlike the respondent in *Middlesex,* Justice See will face irreparable harm during the duration of the state proceedings against him. In *Middlesex,* there is no indication that the respondent was not prohibited from practicing law during the pendency of the state bar disciplinary proceedings. Here, however, Justice See, who was duly elected by the citizens of Alabama, is disqualified from serving as a judge until final resolution of the JIC's complaint filed in the Court of the Judiciary. *See* ALA. CONST. of 1901, amend. 328, § 6.19 (providing that "[a] judge shall be disqualified from acting as a judge" during the pendency of a complaint filed by the JIC). In light of the serious constitutional questions raised in this litigation, Justice See's inability to perform his duties as an Associate Justice on the Supreme Court of Alabama—based upon an accusation by the JIC—magnifies the irreparable harm. Thus, each day it takes the Court of the

Judiciary to hear Justice See's case, and each day that passes during any appeals process, unmistakably constitutes irreparable harm to Justice See. Additionally, Defendants have not and, presumably, cannot guarantee that Justice See would be allowed to carry out the duties of his office during the pendency of the proceedings before the JIC and any appeal of the JIC's findings, should an appeal be necessary.[7]

Second, unlike the respondent in *Middlesex,* Justice See does not have full and fair opportunity to challenge the constitutionality of the disputed Canons. Similar to the New Jersey Supreme Court in *Middlesex,* the Supreme Court of Alabama wrote, promulgated, and adopted Canons 2A and 7B(2).[8] Unlike the respondent in *Middlesex,* however, Justice See cannot bring an immediate and interlocutory appeal to the Supreme Court of Alabama in order to argue and have decided his constitutional challenges to the Canons at issue. In other words, there is no mechanism by which the accused can first raise constitutional challenges and have those challenges heard by the Supreme Court of Alabama prior to the proceedings on the merits in the Court of the Judiciary. Thus, Justice See cannot bypass the Alabama Court of the Judiciary.

As Defendants note, Rule 8 of the Rules of Procedure for the Court of the Judiciary mandates that hearings will be set "as expeditiously as possible."[9] Further, Defendants point out that once hearings are

---

**7.** Counsel for Defendants argue that judicial candidates who choose to run for office in Alabama necessarily subject themselves to the potentially harsh consequences of § 6.19 of Amendment No. 328. While this assertion is true, in and of itself, it ignores the fact that candidates who choose to run for an office of the judiciary in Alabama are not stripped of their First Amendment rights as a consequence. While one may question the propriety of Alabama's system of electing its state judges, the fact remains that it is the system chosen by the citizens of Alabama. As such, it is a system bound to collide with the modern day realities of political campaigns. That is, with candidates for the state judiciary running political campaigns, the Canons of Judi-

cial Ethics will inevitably collide with issues of free speech.

**8.** Indeed, as counsel for Plaintiffs succinctly stated, the Supreme Court of Alabama "gave birth" to these Canons. The Supreme Court of Alabama promulgated Canon 7B(2) three years ago in an Order to which eight of the nine Justices concurred. Justice See was the lone dissenter, arguing that Canon 7B(2) violates the freedoms of speech provided under the First Amendment. Thus, it appears that Justice See is prophetic.

**9.** Defendants also note that, "[a]rguably," instead of filing his Complaint in federal court "had Justice See followed the procedures of the Court of the Judiciary, this matter may

conducted and the Court of the Judiciary decides the matter, a judge "aggrieved by a decision of the Court of the Judiciary may appeal to the [Alabama] Supreme Court." See ALA. CONST. of 1901, amend. 581, § 6.18(b). However, the fact of Rule 8 does not change the reality of Justice See's predicament, discussed above. Again, Justice See must wait until the Alabama Court of the Judiciary renders a final decision on the merits of the JIC's complaint against him. Then, and only then, since there is no procedure for an immediate and interlocutory review of constitutional challenges to the Canons, may Justice See take his appeal to the Supreme Court of Alabama. Accordingly, Justice See's available remedies are in contrast to the remedies available to the plaintiff in *Middlesex*, where the New Jersey Supreme Court amended its disciplinary rules "to expressly permit a motion directly to the New Jersey Supreme court for interlocutory adjudication of constitutional issues." *Id.* at 436 n. 15, 102 S.Ct. 2515.

Moreover, it is difficult to imagine that any lower state court, including the Alabama Court of Judiciary, would strike down a canon that has the Supreme Court

of Alabama's indelible stamp of approval on it. Further, four of the Justices that adopted Canon 7B(2) are currently sitting on the Supreme Court of Alabama. Again, it is difficult to imagine that these same Justices would now abandon their staunch position that Canon 7B(2) fully comports with the First Amendment—a position with which this court cannot agree. It is even more difficult, if not impossible, to envision a scenario where Justice See would be heard by the current Justices of the Supreme Court of Alabama. That is to say, Justice See's eight colleagues would, presumably, have to recuse themselves from hearing Justice See's appeal. This presumption is not contested by the Parties.[10] Defendants argue, however, that § 6.10 of Amendment No. 328 provides a solution to this dilemma by vesting power in the Chief Justice of the Supreme Court of Alabama to appoint special justices and judges to hear Justice See's appeal.[11] More directly on point than § 6.10, though, is the power held by the Governor to appoint members of the Bar of the Supreme Court of Alabama to constitute a special court to consider and determine a case such as this.[12] Certainly, the court

have already been resolved." However, based on the entire record in this case, the court finds this argument both unavailing and insulting.

10. Canon 3C of the Alabama Canons of Judicial Ethics states that, "[a] judge should disqualify himself in a proceeding in which his disqualification is required by law or his impartiality might reasonably be questioned...." ALABAMA CANONS OF JUDICIAL ETHICS Canon 3C (1976).

11. The full text of § 6.10 reads as follows:
The chief justice of the supreme court shall be the administrative head of the judicial system. He shall appoint an administrative director of courts and other needed personnel to assist him with his administrative tasks. The chief justice may assign appellate justices and judges to any appellate court for temporary service and trial judges, supernumerary justices and judges, and retired trial judges and retired appellate judges for temporary service in any court. Adequate and reasonable financing for the entire unified judicial system shall be provided. Adequate and reasonable ap-

propriations shall be made by the legislature for the entire unified judicial system, exclusive of probate courts and municipal courts. The legislature shall receive recommendations for appropriations for the trial courts from the administrative director of courts and for the appellate courts from each such court.
ALA. CONST. of 1901, amend. 328, § 6.10.

12. This power arises under § 12–2–14 of the Code of Alabama, the full text of which reads:
12-2-14. Appointment of members of bar to sit as special judges in determination of certain cases.
When by reason of disqualification the number of judges competent to sit in a case is reduced to eight or to six and there is equal division among them on any question material to the determination of the case, the fact shall be certified by the Chief Justice or, when he is disqualified, by the judges sitting to the Governor, who shall thereupon appoint a member of the bar of the Supreme Court to sit as a judge of said court in the determination of said case. Similarly, when by reason of disqualifica-

has a great deal of faith that the Supreme Court of Alabama and the Governor would do all in their power to ensure that Justice See receives a full and adequate hearing. Yet, given the difficulties of making special and political appointments, made more difficult in this extremely controversial matter, any potential relief sought by Justice See from the Supreme Court of Alabama could easily become mired in politics.[13] In short, the facts of this case and the circumstances of such a remedy are too extraordinary and convoluted to guarantee Justice See a fair and adequate hearing.

In sum, the court reiterates that, under normal circumstances, federal courts should not enjoin pending state court proceedings. *See Huffman,* 420 U.S. at 600, 95 S.Ct. 1200. However, based on the foregoing, the court finds that there is nothing ordinary in the circumstances presented to the court today. Therefore, the court finds, for the purposes of abstention, that this case presents such extraordinary circumstances so as to prevent Justice See from receiving a fair and adequate hearing in the state proceedings. In essence, the court finds that a federal court is the only forum in which Justice See can adequately raise his constitutional challenges. Accordingly, the court finds that abstention is not appropriate. Thus, the court has no choice but to exercise its unflagging obligation to hear this controversy.

Based on the foregoing, the court finds that Defendants' Motion To Dismiss is due to be denied. Having decided that abstention is not proper in this case, the court now turns to Plaintiffs' Motion For Preliminary Injunction.

## IV. PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION[14]

■ As the parties are aware, the "grant or denial of a preliminary injunction is a decision within the sound discretion of the district court." *Sierra Club v. Georgia Power Co.,* 180 F.3d 1309, 1310 (11th Cir. 1999) (citing *United States v. Lambert,* 695 F.2d 536, 539 (11th Cir.1983)). While Rule 65 of the Federal Rules of Civil Procedure covers only procedural requirements for issuing a preliminary injunction, federal courts have interpreted Rule 65 to incorporate several common law substantive requirements.

■ To grant a preliminary injunction, a court "need not find that the evidence positively guarantees a final verdict in plaintiff's favor." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.,* 51 F.3d 982, 985 (11th Cir.1995). Instead, the court must find and the movant must show: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed

---

tion no one of the judges is competent to sit in a case or the number is reduced below six, the fact shall be certified by the Chief Justice, if he is competent to sit, or, if not, by the judge or judges sitting, or, if no one is competent, by the clerk of the court to the Governor, who shall thereupon appoint members of the bar of the Supreme Court to constitute a special court of seven members for the consideration and determination of such case.

The word "disqualification," as used in this section, shall include inability to sit by reason of prolonged illness of a chronic nature.

ALA.CODE § 12–2–14 (1975).

**13.** Presumably, any replacement justice that the Chief Justice or the Governor might ap-

point would have read about, heard about, or discussed Justice See's case. Thus, the appointment of replacement justices could easily break down into a process not unlike selecting a jury.

**14.** In finding that Plaintiffs' Motion For Preliminary Injunction is due to be granted, the court restates much of the language used in its July 28, 2000, Memorandum Opinion And Order granting Plaintiffs' Motion For Temporary Restraining Order. The court does so because the substantive requirements for obtaining a temporary restraining order are the same for obtaining a preliminary injunction. *See United States v. Metro. Dade County,* 815 F.Supp. 1475, 1477 (S.D.Fla.1993); FED. R.CIV.P. 65.

injunction may cause the opposing party; and (4) that, if issued, the injunction would not be adverse to the public interest. *See McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir.1998) (citing *All Care Nursing Service, Inc. v. Bethesda Memorial Hosp., Inc.,* 887 F.2d 1535, 1537 (11th Cir.1989)); FED.R.CIV.P. 65. The district court "must exercise its discretion in light of the four prerequisites for extraordinary relief of a preliminary injunction." *Nnadi v. Richter,* 976 F.2d 682, 690 (11th Cir. 1992).

Before addressing the first element necessary for a preliminary injunction, whether Plaintiffs have established a substantial likelihood of success on the merits, the court will address the other three elements.

### A. Irreparable Harm

■ First, Plaintiffs must show that irreparable injury will be suffered unless the injunction issues. The court finds that Plaintiffs have sufficiently established that they will sustain irreparable injury unless the instant Motion is granted. " 'It is well settled that the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction [or a temporary restraining order].' " *Cate v. Oldham,* 707 F.2d 1176, 1188 (11th Cir. 1983) (quoting *Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir. Unit B 1981)); *see also Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). "So too, direct penalization ... of First Amendment rights constitutes irreparable injury" for the purposes of granting temporary injunctive relief. *Id.* (citing *Johnson v. Bergland,* 586 F.2d 993, 995 (4th Cir.1978)) (holding that "[v]iolations of first amendment rights constitute per se irreparable injury"). In short, irreparable harm is not difficult to establish when the impairment of First Amendment rights is at issue.

Justice See was disqualified "from acting as a judge," pursuant to § 6.19 of Amendment No. 328 to the Alabama Constitution of 1901. There is no question that said punishment was the direct result of Justice See's use of allegedly protected speech. Stated differently, it is undisputed that Justice See's current disqualified status is the direct consequence of his remarks about Judge Moore. Plaintiffs maintain that these remarks are protected speech under the First Amendment and that Justice See's punishment resulting from said remarks is unconstitutional. Moreover, Plaintiffs claim that the state Canons authorizing Justice See's punishment and causing the alleged "chilling effect ... on judicial issues" are unconstitutional. Because the "direct penalization ... of First Amendment rights [unquestionably] constitutes irreparable injury," the court finds that Plaintiffs have adequately established irreparable harm justifying the grant of a preliminary injunction. *Cate,* 707 F.2d at 1188.

### B. Balance Of Harm

Second, Plaintiffs must show that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party. Should the court grant Plaintiffs' Motion For Preliminary Injunction, the only harm that would accrue to Defendants would be a delay in their ability to prosecute and seek sanctions against Justice See in the Court of the Judiciary. On the other hand, the court finds that the serious loss of First Amendment freedoms allegedly suffered by Justice See constitutes an inordinate amount of harm to him. This, coupled with the fact that Justice See, a duly elected official, is currently precluded from carrying out the vital obligations he has assumed as an Associate Justice of the Supreme Court of Alabama, leads this court to conclude that greater injury will be inflicted upon Justice See by the denial of the instant Motion than would be inflicted upon Defendants by the granting of said Motion.

## C. Effect On Public Interest

Third, Plaintiffs must establish that, if issued, the injunction would not be adverse to the public interest. The court finds that the public interest will not be adversely affected by issuance of a preliminary injunction in this case. To the contrary, public interest is well served when the application of potentially unconstitutional laws is enjoined and when duly elected officials are not hindered from performing their duties by such laws. This is especially true when, as here, the core principles of the First Amendment are at issue. Accordingly, the court is satisfied that public interest will not be disserved by the granting of Plaintiffs' Motion.

## D. Likelihood Of Success On The Merits

Fourth, and finally, the court turns to whether Plaintiffs have shown a likelihood of success on the merits. Section 6.19 of Amendment No. 328 to the Alabama Constitution of 1901 states that any judge who is charged by the JIC with violating a Canon of Judicial Ethics will be "disqualified from acting as a judge." Because Justice See has been charged with violating Canons 2A and 7B(2), success on the merits in this matter requires that Justice See establish a substantial likelihood that he will succeed on his claims that the charges against him under Canons 2A and

15. The court notes, however, that while Plaintiffs also challenge the constitutionality of § 6.19 of Amendment No. 328, this challenge is not implicated at this stage of the litigation because, as discussed below, the court finds that there is a substantial likelihood that the underlying Canons that trigger the application of § 6.19 are unconstitutional.

16. The court notes that, prior to the briefs on Defendants' Motion To Dismiss, the Parties had not focused on the constitutionality of Canon 2A. Therefore, the court did not address this Canon in its July 28, 2000, Memorandum Opinion And Order.

17. Canon 3A(6), in turn, provides as follows:

A judge should abstain from public comment about a pending or impending proceeding in any court, and should require

7B(2) violate his constitutional rights.[15] The court first addresses the charge against Justice See under Canon 2A.[16]

### 1. Plaintiffs' Claims As To Canon 2A

■ As stated, Plaintiffs challenge the constitutionality of Canon 2A, as applied to Justice See. Canon 2A reads as follows: "A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." ALABAMA CANONS OF JUDICIAL ETHICS Canon 2A (1980).

The JIC's complaint, filed with the Court of the Judiciary on July 21, 2000, asserts that, "in the course of a judicial campaign," Justice See "failed to respect and comply with the law and to conduct himself in a manner that promotes public confidence in the integrity and impartiality of the judiciary," in violation of Canon 2A. (Compl., Ex. A, ¶ 19.) The JIC charges Justice See with violating Canon 2A when Justice See, "through his campaign spokesperson, criticized Moore's conduct in not explaining his sentences when an explanation by Moore would have been in violation of Canon 3A(6)."[17] (Id.) The criticisms spoken by Justice See's campaign spokesperson, in effect, questioned Judge Moore's silence after Justice See ran a campaign advertisement portraying Judge Moore as being lenient on drug offenders.[18]

similar abstention on the part of court personnel subject to his direction and control. This subsection does not prohibit judges from making public statements in the course of their official duties or from explaining for public information the procedures of the court.
ALABAMA CANONS OF JUDICIAL ETHICS Canon 3A(6) (1976).

18. The campaign spokesperson's comment, which was printed in the Birmingham News, was as follows: "Sadly, instead of explaining why [Judge Moore] has let so many drug dealers off with little or no jail time, Roy Moore is attacking Justice See," she said. "Instead of explaining to voters his record for leniency on drug dealers, he's evading the tough questions his rulings raise." (Compl., Ex. G.)

In bringing this lawsuit, Plaintiffs contend that Canon 2A, as applied by the JIC to Justice See, abridges the First Amendment "insofar as [Canon 2A] precludes a judge who is a candidate for political office from making truthful statements during the course of a political campaign." (Compl.¶ 32.) The question of whether Plaintiffs are entitled to a preliminary injunction on the basis of their as-applied First Amendment challenge to Canon 2A depends upon whether there exists a substantial likelihood that Plaintiffs will succeed on the merits of this claim. For the reasons to follow, the court finds that such a likelihood exists.

When a plaintiff challenges the constitutionality of a statute as applied, a court must determine the level of scrutiny to apply when reviewing the statute. *See Bullfrog Films, Inc. v. Wick,* 847 F.2d 502, 509 (9th Cir.1988). Over the long road of § 1983 jurisprudence, the Supreme Court has articulated three levels of scrutiny to apply to challenged state actions. The level of scrutiny applied depends on the interests at stake. *See Regan v. Taxation With Representation,* 461 U.S. 540, 547, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983). It is undisputed that, in this case, Canon 2A implicates Plaintiffs' fundamental rights protected by the First Amendment. Typically, state actions which implicate fundamental constitutional rights are reviewed under the strict scrutiny standard. *See Williams v. Rhodes,* 393 U.S. 23, 31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). For the purposes of Plaintiffs' Motion For Preliminary Injunction, however, the court will apply intermediate scrutiny.[19] Under both strict and intermediate scrutiny, the burden falls on the state to defend the constitutionality of the contested state action.[20] *See Simon & Schuster, Inc. v. Members of the New York State Crime Victims Bd.,* 502 U.S. 105, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (strict scrutiny burden on government to show content-based regulation of speech is necessary to serve a compelling state interest and is narrowly drawn to achieve that end); *see also Turner Broadcasting System, Inc. v. FCC,* 520 U.S. 180, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (intermediate scrutiny burden on government to show that content-neutral speech regulation advances important interests unrelated to the suppression of speech and that the regulation does not burden substantially more speech than necessary).

Accordingly, when examining whether Plaintiffs have a likelihood of success on the merits on their Canon 2A claim, the court notes that Defendants will ultimately bear the burden of demonstrating that Canon 2A, as applied to Justice See, survives First Amendment scrutiny. Thus, whether Plaintiffs have a likelihood of success on the merits depends on whether Defendants prove that the challenged state action—Canon 2A—meets the standard of intermediate scrutiny.

Applying intermediate scrutiny, Defendants assert that the substantial governmental interest in promulgating Canon 2A is "to preserve the integrity and impartiality of the judiciary" and that "prohibiting a judge from speaking on pending cases is a restriction no greater than necessary."

19. The court finds that it need not decide whether Canon 2A triggers strict or intermediate scrutiny at this stage of the litigation. Because the court finds that Plaintiffs' likelihood of success on the merits of their claim against Canon 2A is the same under both strict and intermediate scrutiny, the court will apply the less-exacting intermediate scrutiny test. Defendants articulate this test as follows: " '[T]he regulation of a judge's speech will be upheld if it furthers a substantial governmental interest unrelated to the suppression of expression, and is no more restrictive than necessary.' " (Doc. No. 12 at 27, quoting *In re Inquiry of Evan W. Broadbelt, J.M.C.,* 146 N.J. 501, 683 A.2d 543 (1996)).

20. Contrast this with state actions which trigger a mere rationality standard. In those cases the burden falls on the party challenging the state action to prove that it is not rationally related to a legitimate government interest. *See Kite v. Marshall,* 661 F.2d 1027, 1030 (5th Cir.1981) (citing *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)).

(Doc. No. 12 at 28.) Thus, Defendants assert that, when Justice See criticized Judge Moore, he failed to uphold the integrity of the judiciary, in violation of Canon 2A. Therefore, according to Defendants, "Canon 2A is constitutional as applied in this case," thereby foreclosing even the possibility that Plaintiffs will succeed on the merits. (*Id.*) The court disagrees.

Even under mid-level scrutiny, as argued by Defendants, the court finds that Canon 2A, as applied in this case, appears to be more restrictive than necessary. The court reaches this conclusion because, by all indications, Canon 2A is inapplicable to Justice See based on the facts presently before the court.

As stated, the JIC contends that Justice See violated Canon 2A when he knowingly allowed his spokesperson to make criticisms to which Judge Moore could not respond without violating Canon 3A(6). According to Defendants, Judge Moore could have readily shed this appearance of leniency by explaining two points: first, that he imposed the sentences in question based upon recommendations made by the District Attorney and plea agreements made by the District Attorney and the criminal defendants; and, second, that in revocation proceedings, he extended defendants' terms of probation only in cases where incarceration was prohibited by law. (Doc. No. 5 at 5.) However, Defendants claim that these expositions were not available to Judge Moore because it would have been impossible for him to comment on Justice See's criticism without violating Canon 3A(6). (*Id.* at 5–6.) In their own words, Defendants state that: "As a sitting associate justice on the Alabama Supreme Court, Justice See knew or should have known that Canon 3A(6) prohibited Judge Moore from explaining pending cases. Nevertheless, Justice See's campaign questioned why Judge Moore had not made such explanation. That conduct by Justice See is the conduct serving as

the basis" of the instant charge. (Doc. No. 12 at 27.)

However, as pointed out by Plaintiffs, this proposition is directly contradicted by the JIC's own Advisory Opinions:

> [I]t is the opinion of the Commission that a judge may make general references to court records, statistics and procedures. A judge may also explain generally that sentences on guilty pleas were, in many cases, based upon recommendations of the district attorney and acquiesced in by the victim or his family. Also, a judge may comment on the useful effects of probation as a part of our law system or our court procedure.

Ala.Jud. Inquiry Comm'n Adv.Op. 82–156 (May 6, 1982).

> A judge may also explain generally that sentences on guilty please, [sic] in the vast majority of cases, were [sic] upon the recommendations of the State, the officer, the victim or were [sic] dictated by law, and that the disposal of cases in this manner constitutes a useful tool for law enforcement and save the taxpayers money. A judge may also comment on the probation statistics of his court and explain generally the useful effects of probation.

Ala.Jud. Inquiry Comm'n Adv.Op. 80–85, 80–86 (July 1, 1980).[21]

Therefore, based on the foregoing arguments and the record presently before the court, it appears that Judge Moore was indeed authorized to respond to the criticism lodged against him by Justice See's spokesperson. Consequently, it appears that the premise upon which the JIC bases its Canon 2A charge against Justice See cannot stand. In other words, if Judge Moore could have responded to Justice See's indirect criticisms, which, by all indications he could have, then Justice See's speech cannot be restricted under Canon 2A. Thus, it appears that Count 3 of the

---

**21.** Plaintiffs cited these opinions in their brief and Defendants have not contested the validity or relevancy of said opinions.

JIC's complaint must fail. Accordingly, the court finds that Justice See has established a substantial likelihood of succeeding on the merits of his claim that Canon 2A is unconstitutional as applied to him because Canon 2A appears to be inapplicable to Justice See in the manner advanced by the JIC.

**2. Plaintiffs' Claims As To Canon 7B(2)**

■ For the reasons stated in its July 28, 2000, Memorandum Opinion And Order regarding Plaintiffs' Motion For Temporary Restraining Order, the court finds that Plaintiffs have established a likelihood of success on the merits of their claims regarding Canon 7B(2).

## V. CONCLUSION

■ As stated and evidenced by the foregoing, this is an extraordinarily complex matter without an easy solution. Accordingly, it goes without saying that this controversy is far from being over and the court does not make a final determination on the merits in today's opinion. Instead, today's opinion, represents the court's attempt to resolve two difficult matters that are crucial to the fair and equitable administration of justice in this case. First, the court decides the threshold question of jurisdiction. Second, after concluding that jurisdiction is proper, the court determines that preliminary injunctive relief is necessary to protect Justice See from irreparable injury and to preserve the status quo until a meaningful decision on the merits can be reached. With this said, the court, once again, emphasizes that its decision today does not mean that Plaintiffs have proven their case. However, Plaintiffs have successfully opposed Defendants' Motion To Dismiss and Justice See has successfully established that he is entitled to preliminary injunctive relief.

## VI. ORDER

Based on the foregoing, it is CONSIDERED and ORDERED that Defendants' Motion To Dismiss be and the same is hereby DENIED.

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, it is further CONSIDERED and ORDERED that, in order to maintain the status quo until such time that the court decides the merits of this case, Plaintiffs' Motion For Preliminary Injunction be and the same is hereby GRANTED in part as follows:

(1) The temporary restraining order entered in this case on July 28, 2000, be and the same is hereby CONVERTED into and CONTINUED as a PRELIMINARY INJUNCTION on the same terms and conditions stated therein.

(2) In addition to the terms and conditions set out in the immediately preceding paragraph, Defendants further are hereby ENJOINED and RESTRAINED, directly or indirectly, whether alone or in concert with others, including any officer, agent, employee, representative or attorney, until further order of the court from enforcing or attempting to enforce Canon 2A, as applied to Justice See by the JIC in the JIC's complaint against Justice See, filed July 21, 2000, which is pending before the Court of the Judiciary of Alabama.

(3) The relief requested by Judge Gaither and Butler in Plaintiffs' Motion For Preliminary Injunction be and the same is hereby DENIED AS MOOT for the same reasons stated in the court's July 28, 2000, Memorandum Opinion And Order.

(4) The bond set for the temporary restraining order in the amount of $1,000 shall remain in effect to support the preliminary injunction.

A Rule 16 Scheduling Order will be issued contemporaneously with this Memorandum Opinion And Order.

The Clerk of the court is DIRECTED to transmit this Memorandum Opinion And Order to the Parties by facsimile and U.S. Mail.