IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 23, 2007

Charles R. Fulbruge III
Clerk

No. 06-10123

KAREN JO BARROW,

Plaintiff-Appellee,
Cross Appellant,

versus

GREENVILLE INDEPENDENT SCHOOL DISTRICT; ET AL.,

Defendants,

DR. HERMAN SMITH,

Defendant-Appellant,
Cross Appellee.

Appeals from the United States District Court
for the Northern District of Texas
(00-CV-913)

Before GARWOOD, SMITH, and DeMOSS, Circuit Judges.

GARWOOD, Circuit Judge:[*]

    In the third appeal resulting from this case,
defendant-appellant Dr. Herman Smith (Smith) challenges the
district court's judgment entered after a jury verdict in favor of

---

[*]Pursuant to 5TH CIR. R. 47.5 the Court has determined that this opinion
should not be published and is not precedent except under the limited
circumstances set forth in 5TH CIR. R. 47.5.4.

plaintiff-appellee Karen Jo Barrow (Barrow). Smith presents three arguments against the judgment, contending that: first, the district court erroneously applied a heightened level of scrutiny in analyzing the constitutionality of the state action at issue in this case; second, the district court erred in deciding to award Barrow attorneys' fees; and third, the district court erred when it ruled that Smith's $30,000.00 joint offer of judgment with codefendant Greenville Independent School District (GISD) and his later $100,000.00 offer, both made pursuant to Federal Rule of Civil Procedure 68, were ineffective to invoke Rule 68's provision requiring certain offerees to pay post-offer costs.

Barrow cross-appeals, arguing that the district court erred in determining the prevailing market rate for Barrow's attorneys and in making downward adjustments to Barrow's attorneys' hours.

For the reasons set forth below, we affirm.

### FACTS AND PROCEEDINGS BELOW[1]

During the summer of 1998, Barrow was employed as a teacher by GISD, where Smith was then a superintendent. Barrow's children were enrolled in the Greenville Christian School, a private religious school.

That summer, an assistant principal position at a middle school became open at GISD, and Barrow applied for the job. In May

---

[1]We have previously chronicled the facts and proceedings of this case. *See Barrow v. Greenville Indep. Sch. Dist.* (*Barrow II*), 480 F.3d 377, 379–80 (5th Cir. 2007), *cert. denied*, U.S. LEXIS 11047 (U.S. Oct. 1, 2007) (No. 07-59).

2

of 1998, at Smith's direction, a senior school official approached Barrow and asked whether she would move her children to the public schools so that she could be considered for the assistant principal position. Barrow responded that she was very much interested in becoming an assistant principal, but she would not remove her children from their private religious school.

After Barrow's name was included in the applicant pool, Smith directed the assistant superintendent for personnel to see if Barrow would move her children to public school. She would not, and GISD hired another person for the assistant principal position. Smith later told Barrow and her husband that he had not recommended Barrow for the position because their children attended private school.

Barrow filed this suit in 2000 under 42 U.S.C. § 1983, alleging that Smith violated her constitutional rights by refusing to consider her for the assistant principal position because Barrow would not move her children from the private Christian school into a GISD school.

Smith moved for summary judgment based on his assertion that he was entitled to qualified immunity, permitting the court to assume for the purpose of his motion that he decided not to promote Barrow at least in part because she chose to educate her children in a private school. The district court granted Smith's motion, finding him entitled to qualified immunity after concluding that

3

the law was not clearly established regarding public school employees' constitutional right to send their children to a private school. We reversed the district court's grant of summary judgment to Smith in this case's first appearance before this court. *Barrow v. Greenville Indep. Sch. Dist.* (*Barrow I*), 332 F.3d 844 (5th Cir. 2003).

After this court decided *Barrow I*, the district court and parties agreed to refer the case for non-binding arbitration concerning the issue of attorneys' fees. On July 27, 2004, the district court judge presiding over the non-binding arbitration recommended that Barrow's fee request be denied in its entirety or, alternatively, drastically reduced.

At trial, Barrow asserted two claims against Smith: a religious rights claim and a parental rights claim. On March 25, 2005, after a two-week trial, the jury reached its verdict. It rejected Barrow's religious rights claim, but found in her favor on her parental rights claim. The jury awarded Barrow $15,455.00 in compensatory damages and $20,000.00 in punitive damages against Smith. Barrow lost all claims against GISD.

Barrow and Smith both filed post-judgment motions, but the district court denied all of these. On December 20, 2005, the district court awarded Barrow $631,293.00 in attorneys' fees and $22,775.22 in expenses and taxable court costs.

Smith filed notice of appeal on January 12, 2006. Barrow

4

cross-appealed.

**DISCUSSION**

I. Level of Scrutiny

To withstand strict scrutiny, a state must show that its challenged action "necessarily relate[s] to a compelling state interest." *Kite v. Marshall*, 661 F.2d 1027, 1030 (5th Cir. 1981). Conversely, the rational basis test requires only that the challenged state action "rationally promote a legitimate governmental objective." *Id*. "A state action viewed under the rational basis banner is presumed to be valid," and the party challenging the state action must show that it is completely arbitrary. *Id*.

Smith argues on appeal that the district court erroneously applied strict scrutiny when it should have used the rational basis test to analyze Barrow's parental rights claim. Specifically, he argues that because the jury rejected Barrow's religious rights claim, there was no justification for applying a level of scrutiny greater than rational basis. Under the rational basis test, Smith asserts, the district court should have entered judgment in his favor. We review constitutional questions *de novo*. *United States v. Perez-Macias*, 335 F.3d 421, 425 (5th Cir. 2003).

In *Barrow I*, we disagreed with the district court's conclusion that the law on public school employees' constitutional right to send their children to a private school was not clearly

5

established, and reversed the district court's judgment. 332 F.3d at 846; *see id.* at 848 (stating that "the constitutional right of public-school employees to select a private-school education for their children was clearly established when Smith refused to consider Barrow for the position of assistant principal"). In reaching our decision to reverse in *Barrow I*, we relied heavily on two of this court's previous opinions: *Brantley v. Surles* (*Brantley I*), 718 F.2d 1354 (5th Cir. 1983), and *Fyfe v. Curlee*, 902 F.2d 401 (5th Cir. 1990). *See Barrow I*, 332 F.3d at 847–48 (discussing *Brantley I* and *Fyfe*).

In *Brantley I*, the plaintiff Brantley brought suit under 42 U.S.C. § 1983 against the superintendent of education and board of education in Montgomery County, Mississippi, alleging that they violated her constitutional rights to direct her child's education by firing her from her position as a public school cafeteria worker "for the sole reason that her son attended a private academy rather than the local public school." 718 F.2d at 1355. Unlike in the present case, there was no suggestion that the plaintiff's decision to send her son to private school was based on religion; Brantley had transferred her son from a public high school to a private, segregated academy in hopes that he "would have a better chance of playing varsity sports at the academy." *Id.* at 1355–56. This court deemed that the decision to transfer Brantley's son to private school fell under the umbrella of the Constitution's

6

guarantee of familial privacy, *id*. at 1359, but we recognized that, "[i]n the realm of public school employment, the court must balance the interests of the school employee with the interest of the state in promoting efficiency in the educational services which it provides through its school employees." *Id*. The panel explained, "The state may legitimately interfere with the constitutionally protected conduct of a public school employee whenever that conduct materially and substantially impedes the operation or effectiveness of the educational program." *Id*. Accordingly, the judgment was reversed and the case remanded to the district court to determine, first, whether Brantley's son's enrollment in private school "materially and substantially interfered with the operation or effectiveness of the educational program" at Brantley's school. *Id*. The panel directed the district court to also determine "whether the protected activity played a substantial part in the board's discharge decision," and that if it did, whether Brantley "would have been fired anyway for reasons completely independent of the private school enrollment decision." *Id*.

Brantley's case appeared before this court again in *Brantley v. Surles* (*Brantley II*), 765 F.2d 478, 479 (5th Cir. 1985) (per curiam), after the district court determined on remand that Brantley was fired from her job for nondiscriminatory reasons. We reversed and remanded again after concluding that the ostensible reason for Brantley's discharge—a disrespectful remark made about

7

a board of education member—could not have been the basis for her discharge. *Id*. at 481–82. But we agreed with the district court's determinations that the private school education of Brantley's son played a substantial part in the board's decision to fire Brantley, and that there was "no evidence that the enrollment of Brantley's son in the private school materially and substantially interfered with the operation or effectiveness of the educational program at the public school." *Id*. at 480. The local superintendent of education had testified that interracial dissension *might* occur after Brantley's son withdrew to enroll in a private, segregated school, but the superintendent's belief was unsupported "by any objective evidence." *Id*.

In *Fyfe v. Curlee*, the plaintiff Fyfe was a secretary to a public elementary school principal when she enrolled her daughter in a private, all-white academy. 902 F.2d at 402. Like the plaintiff in the *Brantley* cases, Fyfe's reasons for selecting a private education for her child were unrelated to religion; she and her husband were concerned about her daughter's experiences with another white child at the public school and thought that her daughter would be happier at the private academy. *Id*. Around the time of Fyfe's decision to enroll her daughter in private school, black citizens began boycotting local businesses, primarily "to put pressure on the school system to increase the number of black teachers and administrators." *Id*. The local school

8

superintendent encouraged Fyfe to resign. *Id*. When Fyfe refused, he transferred her to a newly created, undesirable job. *Id*. at 402–03. Fyfe filed suit under section 1983, alleging retaliation against her for exercising her constitutional right to enroll her daughter in private school. *Id*. at 402. This court concluded that, by transferring her to a menial position, the school district had violated Fyfe's First and Fourteenth Amendment rights. *Id*. at 405. The question then became whether the record revealed that Fyfe's "protected conduct of enrolling her child in a private school was detrimental to the effecient operation of the [] school system." *Id*. We made clear that this analysis—which requires balancing the interest of the school employee with that of the state in promoting efficiency in educational services—"is to be conducted by the court as a matter of law, not fact," *id*., and that the defendant state shoulders the burden to show that the child's enrollment in private school harms the public school system. *See id*. at 406 (because defendant had failed to demonstrate that its interference with the plaintiff's parental rights was necessary for the efficient operation of the school system, plaintiff prevailed as a matter of law). We concluded that the state had "failed to demonstrate that its action in reassigning Mrs. Fyfe was necessary to the smooth and efficient operation of the school system." *Id*. at 406. We explained:

> "[T]he school district produced no evidence of

9

> substantial interference with its effectiveness as a result of Mrs. Fyfe's enrollment of her daughter in private school . . . . The record is completely silent on any effect Shannon Fyfe's move to the private school had on the appellee school district.  This court held in the second appeal in *Brantley* that belief alone of such interference 'unsupported by any objective evidence' is not sufficient to demonstrate material interference to carry the balancing test for the school district. *Brantley v. Surles*, 765 F.2d 478, 480 (5th Cir. 1985)." *Id*. at 405.

Our analysis was unchanged by the fact that a boycott of local businesses had been threatened in case a public school employee enrolled his or her child in a private, segregated school.  There was no evidence that this possibility of a boycott was related to Fyfe, or that it impeded the school system's operation:

> "No causal link was ever made in the district court between the threatened school boycott and Mrs. Fyfe's action.  When asked on cross-examination whether she was aware that one of the demands of the boycotting group was 'that the school system not employ anybody who does now or ever has had a child in a private segregated academy,' the plaintiff responded that she had read about that in the paper.  The mere fact that this demand was made on the school system however cannot be sufficient to demonstrate that Mrs. Fyfe's enrollment of her daughter at a private school caused substantial and material interference with the school system's operation and effectiveness." *Id*. at 405.

When the instant case first appeared before a panel of this court in *Barrow I*, we relied on the *Brantley* and *Fyfe* cases for certain principles.  For example, we stated in *Barrow I* that those cases clarified that "public-school employees like Barrow have a protected right to educate their children in private school," 332 F.3d at 848, and that this public school employee right was clearly

10

established when Smith refused to consider Barrow for the assistant principal position. *Id*. Most important to the instant appeal, in *Barrow I*, we relied on the *Brantley* and *Fyfe* cases in declaring that a "state cannot take an adverse employment action against a public-school employee for exercising this right [to educate his or her child in private school] unless it can prove that the employee's selection of private school materially and substantially affects the state's educational mission." *Id*.

Because we had unequivocally declared in *Barrow I* the state's burden to show Barrow's enrollment of her children in private school caused detriment to its educational mission, we found it unnecessary to address in the opinion from that appeal the question of the degree of scrutiny to be applied to a state's adverse action against a public school employee for sending his or her child to a private school. *Id*. at 849 n.20. We found it to be an unnecessary analysis because, regardless of the level of scrutiny applied, it was still incumbent on the defendant to show that Barrow's selection of school for her children had an injurious effect on the operations of the public school system that employed her. If the defendant failed to meet that burden, its defense would be a nonstarter. We explained:

> "[W]e express no opinion on the particular degree of
> scrutiny a state action must undergo to withstand a
> challenge to its constitutionality in a case like this
> one. Instead, we simply recognize that the state cannot
> strip its school employees of the right to choose a
> private-school education for their children without

11

proving that the unfettered exercise of this right will undermine a state interest. Barrow and amici curiae argue that any state action that interferes with this right is subject to strict scrutiny. We need not take up this question today. In the absence of objective proof that Barrow's choice of a private-school education for her children will undermine a state interest the district's patronage policy fails *irrespective of the degree of scrutiny applied*." *Id*. (emphasis added).[2]

Having found that Barrow asserted a constitutionally protected right, and that Smith interfered with that right, Barrow would prevail if the defendants did not show that the interference was required for the smooth and efficient operations of the school system. This was the effect of our reliance in *Barrow I* on *Brantley* and *Fyfe*.

Smith argues that requiring defendants in a case with facts such as these to show that the public school employee's choice of a private school education for their children impeded with the public school system's operations constitutes strict scrutiny of the defendant school board's actions. Smith asserts that Barrow is not entitled to this degree of scrutiny without a religious component to her claim, and Smith contends that any possibility of such a religious component was eradicated when the jury found that Barrow's religious rights were not violated.

---

[2]We likewise made clear in *Barrow I* that we did not need to decide whether the right asserted by the plaintiff fell under the First Amendment or the Due Process Clause of the Fourteenth Amendment because, regardless, the defendant had the burden of showing that the enrollment of Barrow's children in private school impeded school operations. *See* 332 F.3d at 846–47 (considering together three claims asserted by Barrow because "at bottom all aver that Barrow, a public-school employee, has a constitutionally-protected right to select a private-school education for her children").

12

One might argue that because the jury found that religious rights were not violated, there is no religious component in this case. In this case's second appearance before this court, *Barrow v. Greenville Independent School District* (*Barrow II*), 480 F.3d 377 (5th Cir. 2007), *cert. denied*, U.S. LEXIS 11047 (U.S. Oct. 1, 2007) (No. 07-59), Barrow unsuccessfully challenged the district court's grants of summary judgment in favor of GISD. 480 F.3d at 380. While the *Barrow II* opinion largely focuses on Barrow's argument that Smith was a policymaker and that therefore GISD was liable for his unconstitutional conduct, *see id*. at 380–82, we also addressed Barrow's contention that the district court improperly granted summary judgment in favor of GISD on her religious discrimination claim. *See id*. at 382–83. We agreed with the district court that Barrow had not produced sufficient evidence to show that GISD's employment practices result in a significant disparity between those who are religious and those who are not. *Id*. at 383. We stated further:

> "The record evidence, read in the light most favorable to Barrow, supports the district court's conclusion that Smith did not recommend Barrow because her children were not attending the public schools, not because her children were attending a religious school. There is no probative evidence that Smith's decision had any impact upon any First Amendment-protected freedom." *Id*.

Assuming, then, that *Barrow II* removes the possibility of a religious element to Barrow's claims, Smith relies on several cases for the proposition that the appropriate level of scrutiny to be

13

applied to state actions interfering with parental rights—where there is no religious element—is rational basis.  In particular, Smith cites the United States Supreme Court's decision in *Wisconsin v. Yoder*, 92 S.Ct. 1526 (1972), and two previous opinions of this court: *Kite v. Marshall*, 661 F.2d 1027 (5th Cir. 1981), and *Littlefield v. Forney Independent School District*, 268 F.3d 275 (5th Cir. 2001).

In *Kite v. Marshall*, a case decided before the *Brantley* cases and *Fyfe v. Curlee*, plaintiffs challenged a regulation requiring that any high school student who attended certain summer sports training camps be suspended temporarily from varsity athletic eligibility.  661 F.2d at 1028.  Various reasons supported the rule: "the need to control over-zealous coaches, parents and communities, the achieving of a competitive balance between those who can afford to attend summer camp and those who cannot, the avoidance of various excessive pressures on students, and the abrogation of the use of camps as recruiting mechanisms."  *Id*. at 1030.  The district court declared the rule unconstitutional, but this court reversed, finding that it did not violate either the due process clause or equal protection clause of the Fourteenth Amendment.  *Id*. at 1028. We determined that the rule did not implicate any fundamental constitutional right, and that therefore the appropriate level of scrutiny was rational basis.  *Id*. at 1029, 1030.

14

In *Littlefield v. Forney Independent School District*, individual students and parents of students challenged a district-wide mandatory uniform policy. 268 F.3d at 279. Specifically, the parents contended that the compulsory uniform policy violated their constitutional right to control their children's education in violation of the Fourteenth Amendment. *Id*. at 282. The parents argued that their right to control their children's education was a fundamental right and that therefore the court should apply strict scrutiny in analyzing the school uniform policy. *Id*. at 288. We disagreed, declining to find a "fundamental right for parents to control the clothing their children wear to public schools."[3] *Id*. at 289. We analyzed the asserted parental right under a rational-basis standard. *Id*.

While both *Kite* and *Littlefield* employ a rational basis standard to analyze state interference with parental rights, those cases are distinguishable from the instant case. *Kite* and *Littlefield* address policies relating to what goes on at the public school: ineligibility to participate in school varsity athletics if certain types of summer sport camps are attended, and a district-wide compulsory school uniform policy. The defendant Smith's

---

[3]We explained:
"While Parents may have a fundamental right in the upbringing and education of their children, this right does not cover the Parents' objection to a public school Uniform Policy. It has long been recognized that parental rights are not absolute in the public school context and can be subject to reasonable regulation." 268 F.3d at 291.

15

stance toward Barrow's decision to educate her children in private school does not in any way relate to what occurs at a GISD-operated public school. Stated differently, a rule requiring public school employees to enroll their children in public schools is simply more invasive of parental rights and less clearly tied to the public school's management of its students and educational program than the *Kite* and *Littlefield* rules addressing school varsity athletics eligibility and school uniforms. *Kite* and *Littlefield* are distinguishable, and they are not controlling in this case.

Nevertheless, we acknowledge that it is possible to argue that without a situation akin to that in *Wisconsin v. Yoder*, 92 S.Ct. 1526, only rational basis—and not strict scrutiny—should be applied in evaluating a state action that imposes requirements on parental decisions regarding education. In *Yoder*, respondents had been charged, tried, and convicted of violating the State of Wisconsin's compulsory school-attendance law that required parents to send their children to attend public or private school until the children reached 16 years of age. 92 S.Ct. at 1529. The respondents, two members of the Old Order Amish religion and one member of the Conservative Amish Mennonite Church, had declined to send their 14 and 15 year-old children to public school after they completed the eighth grade, and the children were not enrolled in any private school, nor did they meet any applicable exception to the Wisconsin statute. *Id*. The United States Supreme Court

16

stated:

> "[I]n order for Wisconsin to compel school attendance beyond the eighth grade against a claim that such attendance interferes with the practice of a legitimate religious belief, it must appear either that the State does not deny the free exercise of religious belief by its requirement, or that there is a state interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause." *Id*. at 1532.

The Court found that, in the respondents' case, enforcement of the compulsory school-attendance law after the eighth grade "would gravely endanger if not destroy the free exercise of respondents' religious beliefs," and the focus of its analysis thus turned to whether the state interest was sufficient to override the respondents' religious-based interest in declining to send their children to public school after the eighth grade. *Id*. at 1535. The Court made clear its analysis was more rigorous than the rational-basis test: "[W]hen the interests of parenthood are combined with a free exercise claim of the nature revealed by this record, more than merely a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's requirement under the First Amendment." *Id*. at 1542. The Court concluded that the State of Wisconsin was precluded from forcing the respondents to send their children to formal school until the age of 16 by the First and Fourteenth Amendments. *Id*. Thus, *Yoder* arguably supports Smith's contention that heightened scrutiny is appropriate only where the state action also adversely affects free exercise of religion, which the jury

17

verdict in this case makes clear is no longer at issue.

Even if we agree with Smith, however, that *Yoder* represents the only possible basis for a heightened level of scrutiny in cases dealing with state interference of parental rights, it remains the school district's burden to show that Barrow's decision to send her children to private school had a materially adverse effect on the public school district. This is so because *Barrow I* renders that the law of the case.

Under the law of the case doctrine, "[o]nce a panel of this court has decided an issue of law or fact, the decision continues to govern all subsequent stages of the same case." *Free v. Abbott Labs., Inc.*, 164 F.3d 270, 272 (5th Cir. 1999). This holds true to explicitly decided issues as well as "everything decided 'by necessary implication.'" *In re Felt*, 255 F.3d 220, 225 (5th Cir. 2001) (quoting *Browning v. Navarro*, 887 F.2d 553, 556 (5th Cir. 1989)). The law of the case doctrine is "necessary to bring finality to litigation." *Free*, 164 F.3d at 272. Application of the doctrine is discretionary, but barring exceptional circumstances this court will generally decline to revisit an issue previously decided by another panel in the same case. *Id.; see also United States v. Slanina*, 359 F.3d 356, 358 (5th Cir. 2004) (per curiam) (noting that this court follows its prior decisions without re-examination unless, for example, the earlier decision was "dead wrong"). There are no such exceptional circumstances

18

warranting our reconsideration of the panel's decision in *Barrow I*.

It is true that at the time of *Barrow I* we were faced with a summary judgment motion and therefore had to give Barrow the benefit of the doubt on her religious rights claim, while subsequently the jury verdict and *Barrow II* took that claim out of consideration. However, it remains the law of the case that *Barrow I* relied on the *Brantley* and *Fyfe* cases, which—as we noted above—did not have a religious element, and *Barrow I* expressly held that the requirements of those cases obtained regardless of the level of scrutiny and regardless of whether First Amendment religious rights or merely more general due process parental rights were involved. We held in *Barrow I* that those *Brantley* and *Fyfe* opinions were controlling, and the law of the case requires that we adhere to that prior holding herein.

## II. Attorneys' Fees

Smith faults the district court for acting against the non-binding arbitration recommendation and awarding Barrow attorneys' fees under 42 U.S.C. § 1988.[4] Barrow, meanwhile, cross-appeals, contending that the district court's award of attorneys' fees was

---

[4]Subsection (b) of 42 U.S.C. § 1988, "Proceedings in vindication of civil rights," provides that in actions to enforce section 1983, a court "may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . ."
    "Section 1988 'is a tool that ensures the vindication of important rights, even when large sums of money are not at stake, by making attorney's fees available under a private attorney general theory.'" *Hopwood v. Texas*, 236 F.3d 256, 278 (5th Cir. 2000) (quoting *Farrar v. Hobby*, 113 S.Ct. 566, 578 (1992) (O'Connor, J., concurring)).

the result of improper reduction.  We disagree with both parties and affirm the district court's award of fees.

As we have previously stated, "We cannot overemphasize the concept that a district court has broad discretion in determining the amount of a fee award."  *Associated Builders & Contractors of Louisiana, Inc. v. Orleans Parish Sch. Bd.*, 919 F.2d 374, 379 (5th Cir. 1990).  While we review the award of attorneys' fees for abuse of discretion, "[u]nderlying questions of fact are reviewed for clear error."  *Adams v. Unione Mediterranea di Sicurta*, 364 F.3d 646, 656 (5th Cir. 2004).  Such subsidiary factual questions include determinations of "whether the reported hourly rate is reasonable and whether the reported tasks are duplicative or unrelated to the purposes of the law suit."  *Associated Builders & Contractors of Louisiana, Inc.*, 919 F.2d at 379.  The breadth of discretion accorded to the district court in awarding attorneys' fees is appropriate given that "[a]ppellate courts have only a limited opportunity to appreciate the complexity of trying any given case and the level of professional skill needed to prosecute it."  *Hopwood v. Texas*, 236 F.3d 256, 277 (5th Cir. 2000); *see also Associated Builders & Contractors of Louisiana, Inc.*, 919 F.2d at 379 (stating that the district court's broad discretion is "'appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters'"

20

(quoting *Hensley v. Eckerhart*, 103 S.Ct. 1933, 1941 (1983))).

The district court thoroughly evaluated and considered the propriety of the attorneys' fees award. In its memorandum opinion and order dated December 20, 2005, the district court discussed for over fifty pages its reasons for the attorneys' fees award. Given the district court's impressively careful and thorough consideration of this issue, we cannot conclude that the court abused its discretion. *Cf*. *Associated Builders & Contractors of Louisiana, Inc.*, 919 F.2d at 379 (declaring the abuse of discretion standard possible only where the district court has provided a concise and clear explanation for its award of fees).

### III. Offers of Judgment

Lastly, Smith also contends that the district court erred when it ruled that his Rule 68 offers of judgment were ineffective. At issue are two offers of judgment: one made jointly by codefendants Smith and GISD for $30,000.00, and one by Smith only for $100,000.00. Smith argues that in regards to the $30,000.00 joint offer, the district court should have compared the offer to the recovery Barrow obtained against both Smith and GISD, which Smith argues would make the offer amount greater than Barrow's recovery because the amount Barrow was ordered to pay GISD—or $14,492.65—should be subtracted from her recovery of $35,455.00 from Smith. In relation to his $100,000.00 offer, Smith argues that the district court incorrectly concluded that Barrow's

21

attorneys' fees and court costs, together with her recovery, were such that they defeated the larger offer. Both of Smith's arguments result in his conclusion that he should not be liable for Barrow's post-offer costs or fees and that he should be able to recover his costs from Barrow.

Federal Rule of Civil Procedure 68 "permits defendants in an action to present an offer of judgment to the plaintiffs at any time more than 10 days before trial; the plaintiff has 10 days in which to unconditionally accept the offer." *Ramming v. Natural Gas Pipeline Co. of Am.*, 390 F.3d 366, 370 (5th Cir. 2004). Rule 68 states in pertinent part:

> "At any time more than 10 days before the trial begins, a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against the defending party for the money or property or to the effect specified in the offer, with costs then accrued. . . . If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer." FED. R. CIV. P. 68.

The "severe consequences which may result post-trial from rejection of pre-trial offers" supports Rule 68's purpose of "encouraging settlement" and "discouraging protracted litigation." *Ramming*, 390 F.3d at 370 n.2.

We review the district court's interpretation of Federal Rule of Civil Procedure 68 *de novo*. *Basha v. Mitsubishi Motor Credit of Am., Inc.*, 336 F.3d 451, 453 (5th Cir. 2003). "The district court's findings regarding the factual circumstances under which

22

Rule 68 offers and acceptances are made, however, are reviewed under the clear error standard." *Id*.

We agree with the district court's determination that Smith's two offers of judgment were ineffective. His argument that the amount Barrow paid to GISD should be subtracted from her recovery from Smith in analyzing the $30,000.00 offer is incorrect; Barrow did not recover anything against GISD, and thus there is nothing to consider in relation to GISD in determining Barrow's total recovery. Further, in relation to Smith's $100,000.00 offer of judgment, it is true that if one reduced Barrow's attorneys' fees enough at the time that he made the offer, one could say that Barrow did not recover enough to defeat Smith's second offer of judgment. However, such a result would require a *substantial* reduction of these fees. The district court did not consider the excessiveness of hourly rates for each attorney to be evenly spread between the early and later years of this case. It was not clear error or an abuse of discretion for the district court to determine such a substantial reduction of fees at the time of the $100,000.00 offer would be inappropriate.

## CONCLUSION

For the foregoing reasons, we affirm the district court's judgment.

## AFFIRMED.

23